**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Alex Joseph Pedrin, Jr.,

            Petitioner,

v.

United States of America,

            Respondent.

No. CV-17-00219-TUC-CKJ

**ORDER**

Pending before the Court are Petitioner Alex Joseph Pedrin, Jr.'s § 2255 motions. (Doc. 1 and Doc. 5). The government filed a response (Doc. 8) and Petitioner a reply (Doc. 12). Petitioner requests oral argument and an evidentiary hearing. The Court declines to schedule this matter for oral argument or for an evidentiary hearing.

## Factual and Procedural Background

"For several decades, the Bureau of Alcohol, Tobacco, and Firearms ('ATF') has conducted reverse sting operations in order to identify and apprehend people who can be enticed into robbing fictitious drug 'stash houses' (houses in which drugs are 'stashed'). In these 'stash house stings,' an undercover agent poses as a disgruntled drug courier with knowledge about a stash house protected by armed guards and containing a large amount of cocaine. The agent suggests to targets of the reverse sting that they join forces, rob the house, and split the proceeds. Once the targets have taken steps to rob the fictional house, they are arrested and charged with conspiracy to violate federal narcotics laws." *United States v. Pedrin*, 797 F.3d 792, 794 (9th Cir. 2015).

Richard Zayas ("Agent Zayas") is a special agent with the ATF who posed as one of these disgruntled drug couriers. In 2009, Carlos Omar Perez ("Mr. Perez") was looking for "work" and contacted his uncle, Jesus Contreras Alcaraz ("Mr. Contreras"), a confidential informant. (Doc. 5, pg. 6). Mr. Contreras informed Agent Zayas about Mr. Perez's request. *Id.* Agent Zayas, posing as a disgruntled drug courier, contacted Mr. Perez and, in conjunction with Mr. Contreras, set up a meeting between Agent Zayas, Mr. Perez, Mr. Contreras, and Petitioner on August 17, 2009. (Doc. 12, pg. 3). During that meeting, Agent Zayas relayed his standard story: that he knew about a stash house that was guarded by armed men and that contained a significant quantity of cocaine. (Doc. 8, pg. 3). Agent Zayas "said he was looking for 'someone to go in there and take everything.' He asked the men, 'What do you think? . . . Can that be done?' Each man assented." *Pedrin*, 797 F.3d at 794.

On August 19, 2009, Petitioner and Mr. Perez again met with Agent Zayas and it was agreed that the robbery would take place two days later. (Doc. 8, pg. 4). Agent Zayas "pressed Perez and [Petitioner] for details about their plan. [Petitioner] responded, 'We'll just . . . go right when you go in so we're all together, you know what I mean? . . . Put everybody down. Make them tell us where everything is at and then we leave and then we go split it up.'" *Pedrin*, 797 F.3d at 795. In addition, Petitioner also told Agent Zayas that he had obtained walkie-talkies and scanners to help facilitate the robbery. (Doc. 8-5, pg. 8). Petitioner and Mr. Perez also elicited the assistance of three other participants – Terry Bombard, Cory Lock, and Gilbert Galaz. (Transcript of Jury Trial Day Two, pg. 56, 66). On August 21, 2009, Agent Zayas told the participants that he had rented a storage unit to store his share of the stolen narcotics and requested that Petitioner, Mr. Bombard, Mr. Perez, Mr. Lock, and Mr. Galaz follow him to the unit. (Doc. 8, pg. 5). Agent Zayas' plan was to arrest the participants at the storage unit. *Id.*

Agent Zayas drove alone and was followed by a red Lexus containing: Petitioner, Mr. Bombard, and Mr. Lock, and a blue Stratus containing: Mr. Perez and Mr. Galaz. *Id.* "On the way to the locker, however, the men became suspicious and pulled into a nearby

trailer park. One of the men took a different car to the storage locker location, where he saw ATF agents. He called the others and warned them that it was a sting. The men fled but were picked up by federal and state officers shortly afterward." *Pedrin*, 797 F.3d at 795.

During trial, Mr. Bombard testified that Petitioner had participated in prior stash house robberies and was the leader and organizer of the underlying crime. (Doc. 5, pg. 8). On November 21, 2011, Petitioner was sentenced to a prison term of 210 months for Conspiracy to Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii). Petitioner filed an appeal with the Ninth Circuit Court of Appeals and the Ninth Circuit affirmed this Court's ruling on August 17, 2015. *See Pedrin*, 797 F.3d at 797. Petitioner appealed to the United States Supreme Court but was denied certiorari on May 31, 2016. (Doc. 5-2, pg. 35).

On May 15, 2017, Petitioner filed a Motion under 28 U.S.C. § 2255 (Doc. 1) alleging five grounds for relief:

(1) Trial counsel accepted the Government's case against Petitioner as fact and failed to conduct an independent investigation into the facts and law of the case;

(2) Trial counsel failed to contact, interview, secure and call a critical defense witness whose testimony refuted the Government's case in chief and proved entrapment;

(3) Trial counsel failed to prepare and call Petitioner as a witness at the jury trial in order to present evidence that established that the Government created and presented the crime to Petitioner, and that the Petitioner was not predisposed to commit the crime;

(4) Trial counsel failed to raise a viable entrapment defense; and

(5) Cumulative error.

On May 30, 2017, Petitioner filed an amended §2255 motion. (Doc. 5). In the amended motion, Petitioner raises four grounds for relief:

(1) Trial counsel was ineffective by failing to investigate, preserve, secure, or present exculpatory evidence, in the form of the testimony of a former co-defendant, Mr. Perez before he was deported to Mexico or to have Mr.

Perez paroled into the country to testify or otherwise secure the use of his testimony; this evidence would have changed the result at trial;

(2) The exculpatory testimony of Mr. Perez constitutes newly-discovered testimony that, had it been available at trial, would have changed the result;

(3) Petitioner's trial counsel was also ineffective because he failed to call Petitioner as a witness in his own defense and failed to present an entrapment defense; and

(4) New law or evidence that applies to Petitioner's case provides a basis for relief in that it can now be shown that Petitioner was the victim of selective prosecution.

Petitioner's claims for relief in the original motion relate to an argument that Petitioner's trial counsel was ineffective and that there was cumulative error. Petitioner's amended motion contains similar arguments, but adds a claim that Petitioner was the victim of selective prosecution. The Court will examine each claim separately.

## Analysis

### A. Ineffective Assistance of Counsel

Petitioner's chief argument is that his trial counsel was ineffective because he: (1) failed to investigate, preserve, secure, or present exculpatory testimony; (2) failed to prepare and call Petitioner as a witness at trial; and (3) failed to raise a viable entrapment defense.

As a general matter, to support a finding of ineffective assistance of counsel, a defendant must show two things:

**First**, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. **Second**, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984) (emphasis added).

Generally, "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669.

With that standard in mind, the Court will address each alleged instance of ineffective assistance individually.

1. *Failed to investigate, preserve, secure, or present exculpatory testimony*

Petitioner claims to have informed his trial counsel that Mr. Perez could and would refute Mr. Bombard's testimony by testifying that Petitioner never intended to commit the robbery. Petitioner claims that although counsel was allegedly aware of Mr. Perez's testimony, counsel never interviewed Mr. Perez, or even attempted to interview Mr. Perez. (Doc. 5, pg. 9). In counsel's letter rebutting Petitioner's bar complaint, counsel writes:

> Any testimony by Mr. Perez would have only bolstered the government's case against Mr. Pedrin as it would have added another percipient witness testifying that Mr. Pedrin was the organizer and leader of the "rip crew." It would have made any cross-examination of Mr. Bombard, the government's "star" witness against Mr. Pedrin, ineffective and fruitless. Moreover, Mr. Perez' testimony would have established that Mr. Pedrin had threatened Mr. Perez with physical harm if he did not participate in the stash house robbery.

(Doc. 5-3, pg. 11).

Generally, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. Petitioner claims counsel knew Mr. Perez would provide possibly exculpatory evidence, but provides no evidence to support this contention.

In support of this argument, Petitioner provides an interview of Mr. Perez conducted by his private investigator on November 4, 2013, two years after the conclusion of his trial. Mr. Perez was interviewed by Petitioner's private investigator and stated that neither he, nor petitioner, considered the planned stash house robbery to be "serious" and neither had any "intentions to do it." (Doc. 5-3, pg. 22-29). In that interview, Mr. Perez states that neither he, nor the Petitioner, thought the plan to commit the underlying crime was "serious." They went "along with it just to see how far it would go," and that they "just thought it was a big joke." *Id.* at 26-27.

In his Reply, Petitioner further claims that:

> Perez, as his brief statement shows, both could and would have confirmed that he and Pedrin were never serious about committing the robbery. He would have testified that Contreras badgered them over multiple conversations until they finally agreed to meet with him. He would have testified to conversations between Pedrin and him in which they discussed their belief that Contreras was "full of shit" and that they would just go along with him because they had nothing better to do. He would have testified to discussions between them on the day appointed for the robbery in which they realized Zayas was serious and decided to leave and go home. In other words, Perez, as is evident even from his relatively brief interview statement, could have provided the jury with a great deal of insight, through conversations and actions, into both his and Pedrin's thinking.

(Doc. 12, pg. 6).

Although Mr. Perez provided statements on November 4, 2013 that Petitioner never considered the robbery to be "serious," the relevant inquiry is what testimony Mr. Perez would have provided if he testified in 2011. Since Mr. Perez was a co-defendant, it's certainly possible that Mr. Perez would have only provided testimony favorable to himself and prejudicial to Petitioner. Petitioner acknowledges that since Mr. Perez was a co-defendant, communication with Mr. Perez would have been difficult, but suggests that counsel could "have spoken to Perez' attorney to ascertain whether Perez could be a source of exculpatory testimony" and that once "charges against Perez were dismissed, there was nothing to prevent counsel from sending an investigator to interview Perez, either before or after he left the United States." (Doc. 5, pg. 14). Petitioner claims that counsel "had no

basis for believing that [Mr. Perez's] testimony would not have been favorable or would have been harmful." *Id.* at 9.

However, even if Petitioner's allegations regarding counsel's lack of diligence in pursuing Mr. Perez's testimony are correct, Petitioner's argument still fails. To successfully raise a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner claims that Mr. Perez's testimony "would have changed the result at trial," (Doc. 5, pg. 11) but Petitioner's argument is unavailing. Petitioner cites a myriad of cases in support, but those cases are inapposite.

Petitioner cites *Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999) as support, but *Hart* is distinguishable. In *Hart*, the defendant was charged with molesting his daughter Jennifer during their visits to the R-Ranch camping resort between September 1986 and August 1987. *Id.* at 1068. A witness, Deanne Kendall, testified that between September 1986 and September 1987, she dated the defendant and accompanied him every time he took Jennifer to the R-Ranch and "[b]efore testifying, Kendall informed [defendant's] attorney that she possessed extensive and detailed records that proved the truthfulness of her contention . . . Despite being informed by Kendall that such remarkable corroborating evidence existed, defense counsel failed to investigate its relevance, or to introduce Kendall's receipts and calendars into evidence. He simply put Kendall on the stand to tell her story without any evidentiary support . . . Given Jennifer's testimony that Hart never molested her when another adult accompanied Hart to the R-Ranch, the corroborative evidence in Kendall's possession would have raised substantial doubt regarding Hart's guilt of the specific charges in the information. In fact, had Kendall's receipts and records been presented to the jury, it is highly doubtful that a reasonable juror could have voted to convict on those charges." *Id.* at 1068-69.

Petitioner also cites *Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994). In *Sanders*, defendant Sanders was alleged to have committed a murder, but defendant's brother Xavier

had confessed on several occasions that he, not the defendant, was the murderer. "These confessions were not belated efforts designed to save a brother who had been convicted. They were made from the very inception of these proceedings, and are all internally consistent." *Id.* at 1456. Despite this confession, the defendant's counsel did not interview the brother, call him as a witness during trial, or seek to introduce the confessions in lieu of testimony. *Id.* Rather, when defendant's brother went to trial counsel's office to "tell him what had actually happened, [counsel] was not willing to see him or to speak with him." *Id.* The Court wrote: "[w]hat makes [counsel's] behavior so inexplicable is that he was presented with an opportunity to obtain exculpatory evidence of critical import to his client, evidence that strongly suggested the most viable defense his client possessed—mistaken identity—and he refused to lift a finger to secure it, or even to ascertain its validity." *Id.* at 1460.

The evidence in *Hart* and *Sanders* was evidence of a completely exculpatory nature, demonstrably proving that the defendants did not commit the charged crime. The situations in both *Hart* and *Sanders* are significantly unlike the situation involving Mr. Perez. Unlike Deanne Kendall or Xavier Sanders, Mr. Perez will not provide testimony, with corroborating evidence, that will completely exonerate petitioner. Rather, Mr. Perez's testimony relates solely to the fact that he and Petitioner did not consider the robbery to be of a "serious" nature. Mr. Perez's testimony strains credulity and is contradicted by: the underlying facts, Petitioner's recorded statements, the involvement of additional participants (who were furnished by Petitioner and Mr. Perez), Petitioner's prior criminal history, and the testimony of Mr. Bombard.

Petitioner critically overstates the nature of Mr. Perez's testimony and claims that "his testimony would have been entirely exculpatory as to Petitioner." (Doc. 5, pg. 14). There is no evidence that Mr. Perez's testimony would be "entirely exculpatory." Even if Mr. Perez had testified in a manner consistent with his November 2013 interview, Petitioner's result at trial would be unchanged. The evidence against petitioner is legion. Though Mr. Perez claims that Petitioner believed the robbery to be a "joke," Petitioner's

own actions directly contradict this. The oft repeated maxim is true, actions speak louder than words, and it is equally true that actions speak louder than thoughts. Petitioner's actions unambiguously illustrate that he was knowingly involved in the planning of a drug-house robbery.

Mr. Perez states during an interview that he knew his uncle was involved in illegal activity. *See* (Doc. 5-3, pg. 26) ("Well I knew my uncle was always in bad footsteps."). If Mr. Perez knew that Mr. Contreras was involved in illegal activity, it is incredible that he, or Petitioner, would have considered the robbery to be a "joke." Additionally, Petitioner and Mr. Perez introduced three participants – Mr. Bombard, Mr. Lock, and Mr. Galaz – to the robbery. *See Pedrin*, 797 F.3d at 795 ("In response to Zayas's questions, Pedrin said he and Perez had recruited three other men."). Mr. Bombard has a lengthy criminal history, with prior convictions for: aggravated assault with a deadly weapon during the commission of a home invasion, felony criminal damage, aggravated battery on a police officer, and felony trespass. (Transcript of Jury Trial Day Two, pg. 13). It is highly likely that Petitioner was aware of Mr. Bombard's criminal history. If he truly believed that the stash-house robbery was just a "joke" he certainly would not recruit the involvement of an individual who had previously committed a home invasion to be an additional participant in the robbery. Furthermore, Petitioner made numerous statements regarding how the robbery was to be conducted. He explained that the group would "go right when you go in so we're all together, you know what I mean? . . . Put everybody down. Make them tell us where everything is at and then we leave and then we go split it up." *Pedrin*, 797 F.3d at 795. Petitioner also informed Agent Zayas that he had procured walkie-talkies and scanners to help facilitate the robbery. *Id.*

Considering the substantial volume of evidence that directly contradicts Mr. Perez's testimony, and the absence of any corroborating evidence, the Court finds that even if Mr. Perez had testified at trial, it is highly unlikely that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, petitioner's claim that counsel was ineffective due to his decision not to pursue the testimony of Mr. Perez fails.

## 2. *Failed to prepare and call Petitioner as a witness at trial*

Petitioner further claims that counsel was ineffective because he failed to prepare and call Petitioner as a witness at trial. It is well established that criminal defendants have the constitutional right to testify on their own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987). "The Strickland standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009) (citing *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007)).

Notably, in Petitioner's bar complaint dated February 20, 2013, he lists a myriad of grievances with counsel, claiming that counsel was ineffective, but nowhere does Petitioner list his inability to testify at trial as a reason for counsel's ineffectiveness. (Doc. 1-2, pg. 16-20). Petitioner seems to first raise this issue in his initial §2255 motion. (Doc. 1). Petitioner claims that "counsel discouraged [him] from testifying stating that if he put him on the stand at trial the government would bring out his prior criminal history and that [t]his would hurt Pedrin's defense." (Doc. 1-1, pg. 20). During Petitioner's trial, counsel stated to the jury that Petitioner's choice to not testify was "a decision that was made based on [counsel's] advice." (Transcript of Jury Trial Day Three, pg. 132). Plaintiff fails to meet the first prong of the *Strickland* test which requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Here, counsel advised Petitioner not to testify due to Petitioner's prior criminal history, which the government would use to impeach him. (Doc. 8-6, pg. 3-4).

Attorneys regularly advise their clients not to testify during trial for strategic reasons and courts routinely consider this advice to be reasonable. *See Matylinsky*, 577 F.3d at 1097 ("[Defendant] insists that his testimony would demonstrate to the jury that he neither premeditated nor deliberated, as required for first-degree murder. However, the state court was not unreasonable in finding that this testimony would not have assisted [defendant's] case. Had he taken the stand, he would have been subjected to damning cross-examination

on his prior convictions."); *Barner v. State of Nev.*, 19 F.3d 25 (9th Cir. 1994) ("[Defendant] had a recent felony conviction and a record of public intoxication and referrals to child protections agencies. In these circumstances, [defendant] has not overcome the presumption that counsel exercised acceptable professional judgment in deciding not to call him to testify.").

Counsel's advice to Petitioner to not testify on his own behalf was reasonable. Not only would the government impeach him regarding his lengthy criminal history, including his involvement in the drive-by-shooting of a young mother and multiple convictions for the possession of narcotics, (Petitioner's Presentence Report, pg. 6-9), the government would also subject him to an intense cross-examination relating to his highly incriminating recorded comments indicating his knowledge of how to conduct a home invasion, his introduction of Mr. Bombard, a criminal with a previous conviction for a home invasion, to the robbery, and other highly damning evidence. Counsel's strategic trial decisions cannot be subjected to a post-hoc critical analysis and used as a basis to claim ineffective assistance of counsel. When "action that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney, the assistance of counsel has not been constitutionally defective." *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974) (citing *McMann v. Richardson*, 397 U.S. 759 (1970)); *see also Strickland*, 466 U.S. at 690-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Therefore, due to the probable prejudicial effect of Petitioner's testimony, and the lack of evidence showing that "the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, the Court finds that counsel was not ineffective for advising Petitioner not to testify at trial.

### 3. Failed to raise an entrapment defense

Petitioner also alleges that counsel was ineffective for failing to raise an entrapment defense and claims that Mr. Perez's testimony "refuted the government's case in chief and proved entrapment." (Doc. 1-1, pg. 12). "The affirmative defense of entrapment contains two elements: government inducement of the crime and absence of predisposition on the part of the defendant." *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003) (citing *United States v. Poehlman*, 217 F.3d 692, 693 (9th Cir. 2000)). "The entrapment defense is meant to prevent the government from convincing someone who will not be persuaded by criminal motivations to commit a crime." *United States v. Spentz*, 653 F.3d 815, 819 (9th Cir. 2011).

Petitioner claims that Agent Zayas and Mr. Contreras induced him "to engage in the conspiracy to rob a fake stash house," (Doc. 1-1, pg. 13) and that "[t]he testimony of Carlos Omar Perez was critical to Pedrin's defense in this case because his testimony, coupled with Pedrin's, established entrapment." (Doc. 1-1, pg. 15). The Court notes that Petitioner alleges inducement despite his simultaneous claim that he never believed that the stash-house robbery was "serious." Petitioner claims that "[i]n the instant case, a lot of the pressure came from Perez's own uncle who used his statue [sic] as an authoriative [sic] family member to 'insist' repeatedly that the defendants participate in the conspiracy to commit the fake stash house robbery." (Doc. 1-1, pg. 23). In support, Petitioner cites Mr. Perez's November 4, 2013 interview. In that interview, Mr. Perez mentions that his uncle "kept insisting, telling us about this opportunity" but in that same sentence also mentions "we were just going along with it, we were never serious about it. We never had the intentions to do it." (Doc. 1-2, pg. 5).

Later in the interview, Mr. Perez similarly states that his uncle "kept insisting, he kept calling my phone, he kept sending me messages . . . he just kept insisting and insisting," but just a few lines later Mr. Perez again states that "we were just kinda just going along with it just to see how far it would go, we didn't think it was serious." *Id.* at 6. Petitioner claims that "the evidence of psychological pressure placed on Pedrin was

overwhelming and might well have resulted in a successful entrapment defense, as either a matter of law or fact. Perez uncle used his status as an older family member to 'insist' repeatedly that Perez and Pedrin listen to Zayas' plan. Pedrin was also under the influence of Perez, a close friend he had known since the 6th grade. The government also 'oversold' the plan and put pressure on Pedrin by imposing an artificial [sic] time constraint." (Doc. 12, pg. 12) (internal citations omitted).

"Inducement can be any government conduct creating a substantial risk that an otherwise lawabiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship. An inducement consists of an opportunity plus something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Cortes*, 757 F.3d 850, 858 (9th Cir. 2014) (internal citations and quotations omitted). Petitioner has provided no evidence that he was subjected to excessive pressure by the government to commit the stash-house robbery.

Petitioner claims that Mr. Contreras's persistence in calling Mr. Perez's phone, in conjunction with Mr. Contreras's "status as an older family member" constitutes inducement. Although petitioner frames Mr. Contreras's calls as "evidence of psychological pressure," this argument is unavailing, especially in light of Petitioner's argument that he didn't find Mr. Contreras' statements to be "serious." Similarly, Petitioner's claim that he "was also under the influence of Perez, a close friend he had known since the 6th grade" fails. Petitioner clearly wishes to have his cake (and to eat it too). Petitioner argument is disingenuous. Petitioner cannot claim that Mr. Perez "influenced" him to commit the crime while simultaneously arguing that neither he, nor Mr. Perez, considered the stash-house robbery to be "serious."

Although Petitioner alleges that he was induced to engage in the conspiracy, the facts blatantly contradict his claim. The facts are thus: Mr. Perez and Petitioner were introduced to Agent Zayas and planned a stash-house robbery over the course of a few

days. Petitioner made multiple incriminating statements, that were recorded, evincing his familiarity with such robberies. Petitioner and Mr. Perez introduced three additional participants to the stash-house robbery, one of whom had a significant criminal record, with a prior conviction for a home invasion. Petitioner also stated that her furnished "walkie talkies and scanners" in preparation for the robbery. (Doc. 8-5, pg. 8). Nevertheless, Petitioner claims that he both considered the robbery to be a "joke" and that he was also induced to participate in the crime.

Since there is no indication of governmental inducement, the Court declines to consider whether petitioner was predisposed to commit the crime. Furthermore, despite Petitioner's contentions, even if counsel had introduced Mr. Perez's testimony in connection to a possible entrapment defense, it is unlikely to have resulted in a different result at trial. There was significant evidence implicating Petitioner and, therefore, Petitioner has not raised a legitimate claim for ineffective assistance of counsel for this reason.

### B. Selective Prosecution

Petitioner also alleges that the government "targeted" Petitioner "and did so in a manner that resulted in invidious discrimination and selective prosecution." (Doc. 5, pg. 21). In connection with this claim, Petitioner provides a lengthy summary of his outrageous governmental conduct claim that was previously rejected on appeal. *See Pedrin*, 797 F.3d 792.

To establish a prima facie case of selective prosecution "a defendant must show that others similarly situated have not been prosecuted and that the prosecution is based on an impermissible motive." *United States v. Wayte*, 710 F.2d 1385, 1387 (9th Cir. 1983), aff'd, 470 U.S. 598 (1985). Petitioner alleges that the government targeted him due to his Hispanic ancestry and attaches "new research" – a voluminous report (the "Report") by a law school professor examining how ATF stings disproportionately targeted Black and Hispanic persons in the Chicago metropolitan area.

…

More specifically, Petitioner alleges that:

> The facts of Petitioner's case support such a claim, once bolstered by this new research. Petitioner and all of the persons arrested in this matter were either of Hispanic or African-American heritage.[1] All were indigent. The means of recruitment used by Agent Zayas, working through an [sic] Hispanic CI to troll through his community, without any limitations or guidelines, and without any assurance that the CI or the agent would have any prior knowledge of the targets backgrounds, activities, or predispositions, virtually and practically ensured that members of these minority groups would be disproportionately targeted and swept up for prosecution.

(Doc. 5, pg. 30).

Petitioner further alleges:

> [The Report] however, together with other more localized cases such as *Black*, provides at least a *prima facie* showing that such discrimination is occurring in this geographical area in Zayas-directed and Zayas-inspired stings following the same pattern as in the Chicago are [sic] and may have infected Petitioner's case, such that a [sic] resources should be provided and an evidentiary hearing set on this claim. The new research shows that not only did the government overreach, creating a crime where none existed, but discriminated on the basis of race and ethnicity, focusing their enforcement efforts on members of minority communities and using different standards in investigating these cases. Thus, instead of bringing criminals to justice, the government acted oppressively to exploit people who were, at most, engaged in "thought crime" and were among the poorest and most vulnerable members of society. They focused their attentions on members of minority communities and unconstitutionally discriminated against them. For these reasons, the conduct of Zayas and the paid government informant was outrageous and offensive to basic principles of justice.

*Id.* at 31.

The Court is not convinced that the underlying facts or this "new research" are a sufficient prima facie showing of selective prosecution. "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that

---

[1] The government claims that none of the defendants in the case are of African-American heritage. (Doc. 8, pg. 32). Petitioner claims in his Reply that "Terry Bombard, a co-defendant and a target of the investigation, was African-American and Perez, a Hispanic, was part Black." (Doc. 12, pg. 14). A review of Mr. Bombard and Mr. Perez's pre-sentence reports indicates that both men are listed as "White, Hispanic." This identifying information is generally obtained directly from defendants.

the prosecutor has brought the charge for reasons forbidden by the Constitution. Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

Petitioner claims that the government targeted him based upon his ethnic background and provides the Report, coupled with the fact that the individuals arrested for the underlying robbery were of Hispanic origin, as proof that "it is now possible to show that Petitioner was the victim of selective prosecution in violation of his equal protection rights under the 5th Amendment." (Doc. 5, pg. 21). "[T]o establish a prima facie case of selective prosecution, the defendant 'must present enough evidence to demonstrate a reasonable inference of invidious discrimination.'" *United States v. Estrada-Plata*, 57 F.3d 757, 761 (9th Cir. 1995) (citing *United States v. Redondo-Lemos*, 955 F.2d 1296, 1302 (9th Cir. 1992).).

Petitioner claims that he "intends to seek resources from this Court so that he may conduct similar research, to the extent necessary, in the geographical area (Tucson, Arizona) from which his case originated. [The Report] however, together with other more localized cases such as *Black*, provides at least a prima facie showing that such discrimination is occurring in this geographical area in Zayas-directed and Zayas-inspired stings following the same pattern as in the Chicago are and may have infected Petitioner's case, such that a resources should be provided and an evidentiary hearing set on this claim." (Doc. 5, pg. 21).

Petitioner cites *United States v. Black*, 733 F.3d 294 (9th Cir. 2013), as relevant authority supporting his prima facie showing that racial discrimination is occurring in the Tucson, Arizona area in Agent Zayas directed sting operations. In *Black*, four defendants were arrested as part of a reverse sting operation led by Agent Zayas and identical to the one involving petitioner. *Id.* at 298. Before trial, the defendants moved to dismiss the indictment, claiming outrageous government conduct, but were unsuccessful and ultimately convicted. *Id.* At sentencing, the defendants raised a sentencing entrapment

argument, claiming that the sting operation was designed to place the defendants above the amount triggering the statutory minimum sentence of 10 years for conspiracy to possess cocaine with intent to distribute. *Id.* The court rejected their argument and denied their requests to reduce the quantity of cocaine in calculating their sentences. *Id.* The defendants later appealed the district court's rulings, but were unsuccessful, with the court stating that "any error was harmless . . . [and] would not have affected their sentences." *Id.* at 312-13. *Black* in no way provides any relevant support to petitioner's contention that he was the subject to "invidious discrimination."

Furthermore, the Report does not provide a prima facie showing that discrimination is occurring in the Tucson, Arizona area. Even assuming the truth of the Report's conclusions, all the Report does is indicate that there is some evidence that non-White suspects were more likely than White suspects to be targeted for recruitment into stash-house stings in the Chicago metropolitan area. "In order to prove a selective-prosecution claim, the claimant must demonstrate that the prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 457 (citations omitted). Merely showing that an action resulted in a discriminatory effect is not enough, a discriminatory purpose must be shown as well. *See United States v. Olvis*, 97 F.3d 739, 746 (4th Cir. 1996) ("statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose.").

Petitioner has provided no evidence indicating that the government, in this case, acted with a discriminatory purpose and petitioner's claim for selective prosecution will be denied.

…

…

…

…

*C. Cumulative Error*

Petitioner claims that counsel's alleged series of errors warrants a consideration of the cumulative impact of the errors when assessing prejudice.

In his initial §2255 Motion, Petitioner writes:

> In the case at bar, Pedrin asserts that (1) his retained trial counsel, Rafael f. [sic] Gallego, (1) [sic] failed to conduct an independent investigation into the facts, evidence and law of the case, (2) failed to interview, secure and call as a key defense witness, (3) failed to prepare and call Pedrin as an important witness in his own defense, and (4) failed to raise and pursue the entrapment defense that was available through the evidence of this case. Pedrin also asserts that no reasonable competent attorney would have failed to do these things in preparation for the coming jury trial. Had counsel not failed to do these things, there is a reasonable probability of a different outcome in this case.

(Doc. 1-1, pg. 26).

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair . . . The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citations omitted). As the Court has previously discussed, none of the alleged "errors" committed by counsel were actual errors.

Petitioner claims that counsel "failed to conduct an independent investigation into the facts, evidence and law of the case," but this allegation is not an independent allegation, but an allegation in connection to counsel's alleged failure "to interview, secure and call as a key defense witness" Mr. Perez. As has been previously discussed, the failure to secure and call Mr. Perez as a witness was not erroneous. Again, even if counsel's stated reasons for not pursuing Mr. Perez as a witness were false, (Doc. 5-3, pg. 11), Mr. Perez's testimony would have been clearly contradicted by the underlying facts and Petitioner's own recorded statements and actions, and Petitioner cannot claim that he suffered any prejudice.

Furthermore, Petitioner claims that counsel's failure "to prepare and call [Petitioner] as an important witness in his own defense" was erroneous. As has also been previously discussed, counsel's strategic decision to advise petitioner not to testify in his own defense was not error. Petitioner would have been susceptible to intense and highly prejudicial cross-examination of his own statements and actions while planning the robbery, in addition to his criminal history. Finally, counsel's decision not to pursue an entrapment defense was not erroneous. Petitioner has offered insufficient evidence to suggest that the government improperly induced him into conspiring to commit the robbery and that if an entrapment defense was pursued, Petitioner's result at trial would have been different. The evidence that Petitioner does offer is starkly contradicted by the Petitioner's own statements and actions.

Petitioner has not made a showing that counsel committed any errors, let alone a series of errors that would rise to the level of cumulative error.

### D. Additional Motions

Since filing his Amended Motion on May 30, 2017, Petitioner has filed four additional motions. The Court will address each in turn.

#### 1. October 9, 2018 Motion

On October 9, 2018, petitioner filed a Motion to Expand the Record in This Habeas Corpus Proceeding Under 28 U.S.C. § 2255. (Doc. 17). In his Motion, Petitioner requests that the court expand the record to include documents pertaining to his trial counsel's recent arrest and federal criminal charges brought against him. The Court is aware of the current pending criminal case against Petitioner's trial counsel – Rafael Gallego (4:18-cr-01537). While the allegations brought against Mr. Gallego are indeed troubling, Petitioner has not provided adequate evidence that Mr. Gallego has committed any indiscretions in this case and Petitioner's motion (Doc. 17) will be denied.

#### 2. October 15, 2018 Motions

##### a. Motion to Supplement

On October 15, 2018, Petitioner filed a Motion to Supplement §2255 Motions with

Citation to Additional Authority to offer *White v. Ryan*, 895 F.3d 641 (9th Cir. 2018) as relevant supplemental authority. (Doc. 18). *White v. Ryan* is not applicable. That case involved defendant White being sentenced to death for committing murder, allegedly for pecuniary gain. During one of his later appeals, White's attorney failed to challenge the government's evidence that White acted for pecuniary gain based on an erroneous belief that the issue had previously been resolved during a prior appeal. *Id.* at 666. The Court held that "[a] decision based on a misunderstanding of the law is not sound trial strategy." *Id.*

Unlike in *White*, Petitioner has not alleged that counsel elected not to pursue the testimony of Mr. Perez, or to recommend Petitioner not testify on his own behalf, based on an erroneous belief or misunderstanding of the law. Counsel made those decisions based on other factors, including Petitioner's own criminal history. The Ninth Circuit also found that defendant White's attorney neglected to obtain his readily available medical records from his time in custody even though he knew that defendant White's mental health was at issue. His attorney later "testified that he had no strategic reason for not acquiring White's records." *Id.* at 667. This is not a situation where counsel neglected to secure testimony and had no strategic reason for not securing that testimony. Counsel reasoned that he believed Mr. Perez's testimony would be damaging to Petitioner's case. *White v. Ryan* is inapplicable and Petitioner's motion to supplement (Doc. 18) will be denied.

### b. Motion to Expand Record

On October 15, 2018, Petitioner also filed a Motion to Expand Record as to §2255 Motions and Request for Evidentiary Hearing. (Doc. 19). In this motion, Petitioner attaches the indictment in the current pending criminal case against Mr. Gallego and requests an evidentiary hearing. Petitioner also alleges that Mr. Gallego made false statements in an affidavit explaining his decision not to pursue the testimony of Mr. Perez. *Id.* at 4. Again, while the allegations against Mr. Gallego are disturbing, subsequent wrongdoing does not automatically render all preceding decisions erroneous. As the Court has previously stated, Mr. Gallego had legitimate reasons not to pursue Mr. Perez's testimony and to advise petitioner not to testify during trial. Although Petitioner believes that his or Mr. Perez's

testimony would somehow be entirely exculpatory, their testimony would be unconvincing in the face of the considerable evidence to the contrary. This request will be denied.

### 3. October 30, 2018 motion

On October 30, 2018, petitioner filed a Motion to Expedite Habeas Corpus Proceedings and to Set Evidentiary Hearing. (Doc. 22). This request will be denied as moot.

IT IS HEREBY ORDERED:

1. Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody is **denied**. (Doc. 1).

2. Petitioner's Petition for Relief Under Section 2255 (Petition for Writ of Habeas Corpus by a Federal Prisoner, under 22 U.S.C. §2241(c), §2255, and Fed.R.Civ.P., Rule 81 (a)(2) is **denied**. (Doc. 5).

3. Petitioner's Motion to Expand the Record in this Habeas Corpus Proceeding Under 28 U.S.C. § 2255 is **denied**. (Doc. 17).

4. Petitioner's Motion to Supplement § 2255 Motions with Citation to Additional Authority is **denied**. (Doc. 18).

5. Petitioner's Motion to Expand Record as to § 2255 Motions and Request for Evidentiary Hearing is **denied**. (Doc. 19).

6. Petitioner's Motion to Expedite Habeas Corpus Proceedings and to Set Evidentiary Hearing is **denied** as moot. (Doc. 22).

Dated this 2nd day of April, 2019.

Honorable Cindy K. Jorgenson
United States District Judge